## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | CRIMINAL NO. 2007-002 |
| v. ) | |
| ) | |
| BEATRICE LAWRENCE ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## **MEMORANDUM OPINION**

FINCH, J.

THIS MATTER comes before the Court on a Motion to Suppress filed by Defendant Beatrice Lawrence. Defendant's Motion to Suppress is based on two separate grounds: 1) Defendant was arrested without probable cause and 2) Defendant's statements during custodial interrogation were unduly coerced by the government. The United States of America opposes Defendant's motion. An evidentiary hearing was held on December 3, 2007.

**I. FACTUAL FINDINGS**

The Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), at the Henry E. Rohlsen Airport on St. Croix received two anonymous phone calls informing officials that Defendant and a companion would be traveling with drugs in their luggage. The caller stated that the contraband would be placed in the Defendant's luggage after she cleared Customs and the Transportation Security Agency ("TSA") check point. After researching the reservations lists for air carriers at the airport and confirming that Defendant had a flight reservation for November 9, 2006, CPB officials contacted agents at DHS's Bureau of

1

Immigration and Customs Enforcement ("ICE") about their findings. Defendant arrived at the airport with her bags and went through the TSA check point without any problems. After Defendant boarded the aircraft, all passengers were asked to deplane and the bags were removed from the flight. The Virgin Islands Police Department K-9 unit was brought in to go over the bags but the dogs did not alert on any luggage. ICE Special Agents searched Defendant's luggage, finding three small cooler bags of cocaine.

Defendant was informed that drugs had been found in her luggage and was arrested. Agent Eugene Thomas recited Miranda warnings to Defendant before she was taken in for questioning and once again prior to being interrogated. Agent Dennis Carter read the Miranda warnings from a Statement of Rights form and, once the Miranda warnings were given, Defendant was asked whether she wished to talk to the officers. Defendant signed the Statement of Rights, acknowledging that her rights were explained to her and that she waived these rights. Gov't Ex. A.

There were initially three agents in the room with Defendant when the interrogation commenced and one agent left the room to attend to other matters during the interview. The agents took turns asking Defendant questions while the other agent took notes. There was no recording equipment available in the interrogation room. The questioning of Defendant began about 2:30 p.m. and lasted until approximately 5:30 p.m. Agents questioned Defendant about why she was trying to protect individuals who would not come to her aid and who were paying her very little to shoulder all the risks she was assuming. During Defendant's interrogation, one of the agents mentioned to Defendant that the individuals she was protecting would not look out for her or her children or come to their aid. Eventually Defendant provided information concerning the individual who contacted her about the trip and who purchased the tickets as well

2

as her relationship with this individual and other travels she had made to the mainland for this individual.  Defendant also provided information that corroborated the statements made by the anonymous caller.

Defendant alleges that, before she signed the Statement of Rights waiver, she was told that she would not be able to see her children and that she would be locked up for a long time if she did not give a statement.  However, the government denies Defendant's allegations and contends that, after Defendant signed the waiver, the ICE agents told her that she should tell the truth as no doubt this is what she would expect of her own children.  ICE agent Eugene Thomas testified that the two interviewers who interrogated Defendant did not threaten her in anyway but, rather, explained to her that she was looking at time in jail and may be away from her kids.  After hearing this evidence, the Court finds that the ICE agents made statements about Defendant's possible jail time, which would result in separation from her children, but did not state that if she refused to make a statement, she would not be able to see her children.  The Court finds that the statements regarding Defendant's children were made after she signed the Statement of Rights waiver.

ICE agent Thomas testified that his statement regarding Defendant's children did not trigger her confession.  Agent Thomas testified that Defendant did not confess until he took out a writing pad and calculated how much money would be generated from the sale of cocaine, as compared to how much money Defendant would be paid for transporting the cocaine.  According to Agent Thomas, when he showed Defendant the figures, she paused for a short while and then confessed to her involvement.  When Defendant took the stand, she did not testify that the alleged statement about her children caused her to confess.  The Court finds that Defendant's confession was not coerced by any ICE agents' statements pertaining to Defendant's children.

3

**II.  PROBABLE CAUSE TO ARREST**

    **A.  STANDARD OF REVIEW**

Customs agents are given broad authority to conduct reasonable searches necessary to enforcement of customs laws under 19 U.S.C. § 1582.[1]  See also United States v. Ramsey, 431 U.S. 606, 619 (1972) (searches which customs agents are authorized to conduct upon entry are of broadest possible character and neither warrant nor arrest is needed to authorize search in such situation).  The Third Circuit has approved airport border searches in the absence of probable cause or a reasonable suspicion.  U.S. v. Scheer, 600 F.2d 5, 6 (3d Cir. 1979); see also United States v. Glasser, 750 F.2d 1197, 1201 (3d Cir. 1984) (customs search which revealed hashish oil concealed in carved wooden head is valid even without reasonable cause to suspect violation of law).

Every arrest is unreasonable unless supported by probable cause.  Michigan v. Royer, 452 U.S. 692, 700 (1981).  The Supreme Court has defined probable cause as facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person in believing from the circumstances shown that the suspect has committed or was committing an offense. Michigan v. Defillippo, 443 U.S. 31, 37 (1979).  While "probable cause to arrest requires more than mere suspicion…it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt."  Orsatti v. New Jersey State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).  The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is

---

[1] The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.

4

irrelevant to the validity of the arrest. Gerstein v. Pugh, 420 U.S. 103, 119-123 (1975). The Third Circuit has held that district courts "must apply a common sense approach, based on the totality of the circumstances to determine whether there was probable cause to arrest." Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000).

### B. DISCUSSION

The search of Defendant's luggage at the airport constituted a proper border search pursuant to 19 U.S.C. § 1582. Defendant argues that, at the time of her arrest, agents knew that she did not have contraband in her luggage when she arrived at the airport or when she presented her bags at Customs and at TSA. Since the agents knew that someone other than Defendant put the contraband in her luggage, Defendant contends that the government lacked probable cause to arrest her. However, Defendant's argument is unpersuasive because the two anonymous calls the agents received implicating Defendant and the subsequent search of her bags, uncovering more than ten kilograms of cocaine, provided the agents with probable cause to arrest Defendant.

Prior to searching Defendant's bags, the government had a reasonable suspicion that Defendant may be transporting drugs based on the two anonymous phone calls from a tipster. Upon searching Defendant's bag, ICE agents found contraband and the government's reasonable suspicion rose to the level of probable cause. Even though agents knew that someone other than Defendant placed the contraband in her luggage after she cleared Customs and the TSA, the simple fact that drugs were found suggests that Defendant was involved in a criminal plan to transport such drugs. Whether the government ultimately has sufficient evidence to prove Defendant's guilt or whether further investigations would have cleared Defendant from any knowledge of contraband is a separate issue having nothing to do with probable cause. Under

the totality of the circumstances, the finding of drugs in Defendant's luggage was sufficient to warrant a prudent man in believing that Defendant was committing an offense and gave the government probable cause to arrest Defendant.

### III. VOLUNTARINESS OF DEFENDANT'S CONFESSION

#### A.  STANDARD OF REVIEW

In Miranda v. Arizona, 384 U.S. 436 (1966) the Supreme Court held that to protect an accused's Fifth Amendment right against self-incrimination during the inherently coercive custodial interrogation setting, certain procedural safeguards must be employed. These safeguards include the explicit warning that the accused "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." Id. at 479. A court must suppress a statement obtained by a law enforcement officer from a defendant if the officer obtained the statement in violation of the rules enunciated in Miranda. Id.; see also Wong Sun v. United States, 371 U.S. 471, 485-86 (1963) (exclusionary rule requires suppression of any evidence which is either the direct or indirect product of illegal police conduct). Before the government may introduce a defendant's incriminating statement in its case in chief, it must prove a voluntary, knowing and intelligent waiver of the accused's Miranda rights. Miranda, 384 U.S. at 475.

Statements made to law enforcement officials are inadmissible into evidence if the statements are involuntary. Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973). "For a defendant's confession to be voluntary, and thus admissible, the government must prove by a preponderance of the evidence that his will was not overborne and that the confession was the

product of a rational intellect." United States v. Arcediano, 371 F. Supp. 457, 470 (D.N.J. 1974); see also United States v. Velasquez, 885 F.2d 1076, 1087 (3d Cir. 1990) (explaining that a statement is voluntary when it is "the product of free and deliberate choice rather than intimidation, coercion or deception."). In Moran v. Burbine, 475 U.S. 412, 421 (1986), the court explained the concept of a valid waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda right has been waived.

External events surrounding the confession and internal psychological facts are to be considered in determining voluntariness. Culombe v. Connecticut, 367 U.S. 568, 603 (1961). "The flexible totality of the circumstances approach requires the reviewing court to consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused. . . ." Rachlin v. United States, 723 F.2d 1373, 1377 (8th Cir. 1983). Factors to be considered include: the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep. Bustamonte, 412 U.S. at 226. A confession "must not be extracted by any sort of threats of violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Bram v. United States, 168 U.S. 532, 542-43 (1897).

It is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect. Henderson v. Hendricks, 2005 U.S. Dist. LEXIS 32897 at *31 (D.N.J. 2005); Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986).  An interviewer may play on the accused's sympathies or explain that honesty might be the best policy for a suspect who hopes for leniency.  Miller, 796 F.2d at 605; see also Rachlin, 723 F.2d at 1378 (although agents told suspect that it was in his best interest to cooperate, resulting confession was voluntary); United States v. Vera, 701 F.2d 1349, 1363-64 (11th Cir. 1983) (same).  "These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." Miller, 796 F.2d at 605.

### B. DISCUSSION

The government has provided the Court with sufficient evidence to prove that Plaintiff's confession was voluntary.  The facts of this case do not indicate that the ICE agents used abusive tactics or exerted undue pressure to elicit a confession.  Prior to her interrogation, Defendant signed the waiver at the bottom of the Statement of Rights indicating that the waiver of her Miranda rights was freely and voluntarily made.  "Although the mere silence of the accused following the Miranda warnings is not sufficient to constitute a waiver, a signed waiver does support a knowing and intelligent relinquishment of one's rights."  United States v. Brunswick, 2002 U.S. Dist. LEXIS 21288 (D. Del. 2002).  There is no evidence that Defendant's level of intelligence prevented her from understanding the written Statement of Rights which she signed.  Furthermore, Defendant testified that she signed the Statement of Rights form because she understood her rights.

The interrogation was relatively short in duration, lasting less than three hours with two to three officers present during the questioning. Cases in which psychological coercion has been found to result in involuntary confessions typically involved longer periods of interrogation than that to which Defendant was submitted. See, e.g., Blackburn v. Alabama, 361 U.S. 199 (1960) (eight to nine hours); Spano v. New York, 360 U.S. 315 (1959) (two weeks); Payne v. Arkansas, 356 U.S. 560 (1958) (forty-nine hours). There is no evidence that Defendant informed the ICE agents that she no longer wished to answer questions or that she needed a break at anytime during the questioning. There were no physical punishments inflicted on Defendant, she was not physically threatened or harmed, and she was not deprived of food or sleep. Her interview was not "a process of interrogation . . . so prolonged and unremitting, especially when accompanied by deprivation of refreshment, rest or relief, as to accomplish extortion of an involuntary confession." Stein v. New York, 346 U.S. 156, 184 (1953).

During her interrogation, ICE Agent Thomas explained to Defendant that she was looking at time in jail and may be away from her kids. The question is whether these statements were "so manipulative or coercive that they deprived Defendant of her ability to make an unconstrained, autonomous decision to confess." Miller, 796 F.2d at 604-05 (cited by United States v. Walton, 10 F.3d 1024, 1029-30 (3d Cir. 1993)).

Express threats that a defendant's children will be taken away if she fails to cooperate together with other coercive circumstances have been held to be so intimidating that the defendant's statements were rendered involuntary. Lynumn v. Illinois, 372 U.S. 528, 534 (1963). In Lynumm, the Supreme Court held a confession involuntary after an express threat by police that the defendant's children would be taken away from her if she did not cooperate. Id. at 534-35. The court in United States v. Tingle, 658 F.2d 1332, 1336 (9th Cir. 1981) found that

9

similar statements regarding the defendant's children were plainly coercive and threatening, rendering the resulting confession involuntary.

Although the circumstances of the interrogations in <u>Lynumn</u> and <u>Tingle</u> are similar to the present case in that the interrogating officers all made reference to the defendant's children, both <u>Lynumn</u> and <u>Tingle</u> are distinguishable. Because <u>Lynumm</u> preceded the Court's decision in <u>Miranda</u>, the police never read the defendant her constitutional rights. <u>Miranda</u>, 384 U.S. 436. In this case, Defendant signed a written waiver of her <u>Miranda</u> rights and never asked to see her attorney or for the interrogation to stop. In <u>McCalvin v. Yukins</u>, 444 F.3d 713, 721 (6th Cir. 2006), the court discussed the difference between pre-<u>Miranda</u> and post-<u>Miranda</u> cases, explaining that "a confession is much more likely to be voluntary when it is given after a person knowingly and voluntarily waives his Miranda rights." As the Supreme Court explained in <u>Berkemer v. McCarthy</u>, 486 U.S. 420, 423 (1984), "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare."

<u>Lynumm</u> is also factually distinct from the present case. In <u>Lynumn</u>, during her interrogation, the defendant had been surrounded in her home by armed police officers and a twice convicted felon informant who had "set her up." <u>Lynumn</u>, 372 U.S. at 529-30. Police told the defendant in <u>Lynumm</u> that her child would be cut off from state financial aid and would be taken away from her permanently if she did not admit to selling drugs. <u>Id</u>. at 532. "Such a statement is especially sinister because it implicates the children's livelihood." <u>McCalvin</u>, 444 F.3d at 721. In the present case, Defendant was not threatened that she would be taken away from her children or that her children would suffer financial harm if she did not make a

10

statement. Unlike the defendant in Lynumn, Defendant was never promised leniency if she agreed to say whatever the agents requested her to say. Lynumm, 372 U.S. at 531-32.

The court in McCalvin, found that the defendant's will was not overborne where agents stated that she would not have contact with her family or children if convicted of first degree murder. McCalvin, 444 F.3d at 721-22. Distinguishing the case from Lynumm, the McCalvin court reasoned that the only adverse consequences being presented to the defendant were the results of ultimately being convicted of the crime and the defendant would have little incentive to render a false confession under the circumstances if she was innocent. Id. "McCalvin was not made to fear more than the result of being convicted of first-degree murder which included not seeing her children." Id. On the other hand, "in Lynumm, the concern was outright fear of adverse consequences, elimination of government benefits, which may be just as real as the physical fear of adverse consequences in outright torture." Ledbetter v. Edwards, 35 F.3d 1062, 1070 (6th Cir. 1994) (cited by McCalvin, 444 F.3d at 721).

Adopting the reasoning in McCalvin, the Court finds that the ICE agents' statements about Defendant's possible jail time and separation from her children were not misrepresentations and such statements cannot be deemed to be so coercive as to have overborne Defendant's will. If Defendant is found guilty, she is likely to face jail time and be away from her children. The Court is not prepared to forbid agents from conveying to suspects the seriousness of the crime for which they are being investigated. See United States v. Kolodziej, 706 F.2d 590, 594-95 (5th Cir. 1983) (it was not coercion for officer to point out that if defendant was incarcerated, she would lose custody of her child).

Our case is also distinguishable from Tingle because, in that case, it was clear that the purpose of interrogation was to intimidate and coerce the defendant. Tingle, 658 F.2d at 1336. During the interrogation in Tingle, which took place in the back seat of a squad car, agents recited a laundry list of maximum penalties for crimes of which defendant was suspected while she was sobbing and noticeably shaking. Id. at 1334. To induce the defendant's confession in Tingle, agents specifically told defendant that she would not see her two-year old child for a long time while in prison and that she had "a lot at stake." Id. at 1336. Unlike this case, the agent in Tingle promised the defendant that her cooperation would be communicated to the prosecutor, but if the defendant refused to cooperate the agent threatened to tell the prosecutor that she was "stubborn or hard-headed." Id.

In the present case, the ICE agents testified that Defendant was not emotional during her interview and that she was not crying. Defendant never indicated that she was uncomfortable or emotionally unfit to answer questions. To the contrary, Defendant appeared lucid and maintained her composure during her interview. Although she testified that prior to being questioned, she banged her fist and head against the walls of the holding cell, Defendant suggested that this was because she was claustrophobic. An officer opened the door to the holding cell to make sure Defendant was alright and left the door open so that Defendant would feel more at ease. ICE agents never questioned Defendant while she was in the holding cell and were not present when Defendant showed signs of discomfort in the holding cell. Rather, Defendant was moved from the holding cell to the interrogation room prior to any questioning. Defendant testified that she began laughing at one point during her interrogation, indicating that she was not as emotionally distraught as the Defendant in Tingle.

The Court finds the facts in United States v. Prince, 157 F.Supp.2d 316 (D. Del. 2001) to be more in line with the facts of the present case. Like the interrogation in the present case, the interview in Prince lasted for approximately two and a half hours. Id. at 323. In Prince, there was no express threat to take the defendant's children away. Rather, the police explained to the defendant that her children should be her primary concern and a possible jail sentence could affect her children. Id. at 322. Even though Prince seemed fatigued and emotional at times during questioning, the Prince court found that the interrogation was not intended to intimidate or coerce the defendant by threatening to take her children away from her if she did not cooperate. Id. at 328. Therefore, the court held that there was not sufficient evidence to establish that the defendant's will was overborne. Id.; see also Henderson, 2005 U.S. Dist. LEXIS 32897, 34-35 (D.N.J. 2005) (confession was not involuntarily induced when police told Defendant that his girlfriend would lose her children if she lied to grand jury).

The administration of Miranda warnings to Defendant, followed by her signing the waiver of her rights and subsequent statements to ICE Agents indicate an intelligent, knowing and voluntary waiver of Miranda warnings. After a review of the totality of the circumstances, the Court finds that the government has proven by a preponderance of the evidence that Defendant's confession was voluntary. The facts of this case do not suggest that Defendant's "will was overborne," or that she was deprived "of [her] ability to make an unconstrained, autonomous decision." United States v. Giampa, 904 F. Supp. 235, 275 (D.N.J. 1995). The atmosphere in which Defendant was questioned was not overly coercive such that it can be held that any statements made by Defendant were the product of her free will. Thus, Defendant's motion to suppress her statements is denied.

## IV. CONCLUSION

For the reasons stated above, the Motion to Suppress is **DENIED** as to Defendant on all counts. The Court finds that the government had probable cause to arrest Defendant after finding contraband in her luggage. The Court further finds that the statements made during Defendant's custodial interrogation were voluntary and were not the product of undue coercion by the government.

**ENTERED this 30 day of January, 2008.**

                                        /s/
**HONORABLE RAYMOND L. FINCH
U.S. DISTRICT JUDGE**